May it please the court, my name is Wayne Young. I represent the defendant Suzanne Onucian. I'll be sharing our time with Ms. Landau, who also represents the defendant Manukyan. The principal issue I intended yesterday is the 404B issue, and perhaps the grouping issue as far as sentencing. And I guess the question is, was the evidence, 404B evidence, all the evidence about the Moscow kidnapping, and the internet fraud, and the murders, and the Russian mafia, it came in, the government's theory was that's simply not 404B evidence because it's inextricably intertwined, the test, with the conspiracy count, the extortion count, against my client. And there's two parts to that inextricably intertwined test. One is, does the evidence arise from a single criminal episode? And the second is, can the government tell a coherent story without it? In this case, the government clearly could have told a coherent story without the evidence about the Moscow kidnapping. If you look at the excerpt of record, there's only one in the count three conspiracy, the one against my client, there's only one reference to the Moscow conspiracy, and it's at the end of one of the means of the conspiracy test. So I don't think there's any doubt the government could have tried this case only against the extortion in L.A. without any reference to the Moscow conspiracy. Well, they could have certainly, but it would have taken a good bit of the spice out of it, and not just spice necessarily of a prejudicial nature, but it seemed to help explain what was going on here, too. I think it was much more tangential than that, Judge, the spice certainly. It goes from a garden variety extortion with no violence, other than that he was slapped around that day, March 22nd, at the apartment. But really, just a simple extortion to an international Armenian-Russian mafia murder kidnapping. Well, it makes the threats kind of a lot more lively that, gee, and look what's going on over here. So we mean it when we say we can do X to you. Again, I think it was tangential to this case. It certainly adds something to it, but was it necessary? And the second part of the test, the coherent story, it wasn't necessary. The more difficult issue for this side of the courtroom is, or was it not, a single criminal episode? And our argument is that it wasn't. We really have two conspiracies with some overlap, to be sure. The first conspiracy is the Russian one. It involves my client is not a defendant in count one conspiracy. It involves the two other defendants. It involves conduct in Russia and all those other things I've laid out. And then you have count three, the conspiracy to extort, and the substantive counts here in Los Angeles against my client. So it seems to me that it's more like there's two separate conspiracies with a moderate or even a mild amount of overlap. And so on the single criminal episode, it fails as well on those grounds. But weren't they pursuing him to continue to pay $1,000 a month? That wasn't going to come to an end. They did continue to pursue him, Your Honor. Both of them continue to say that you owe us this money. We want it every month. We're going to keep after you to make sure you pay it. And he did pay some of the two of them. That's correct. That's correct. I think there's the one episode that my client received the $1,000 months later. I think that was in July or August. But the point is that the meat of the two crimes, one was in Moscow primarily in February, and the extortion of my client is involved in. Same players. Well, explain something to me. And I don't mean to interrupt you. I'll give you one second. Weren't there the people here who got the people in Russia to kidnap that cousin of theirs or uncle of theirs? It was, Your Honor, but it's our position. It began here and germinated over there? It did. But it was the other two defendants who were properly charged in the count one conspiracy. I guess what it comes down to, and Judge Tabrizian came on the opposite side of this from my point of view, was how intimately involved was my client, Mrs. Onusian, in that Moscow kidnapping? And I submit the evidence about her is very slight. There's just the three overt acts in the count one conspiracy. And those really are Armand's wife, Elmira, recalling months later that, oh, yeah, she said. They said that one hundred and thirty thousand dollars is owed on the big extortion and another ten or twelve thousand dollars on my client's extortion. So, again, there's overlap in the middle among the players. But she was the one who led him into that, wasn't she? Didn't she introduce him to these people? She did. She did introduce them. She was looking for somebody to be an agent. And he was the perfect man to be an agent because they wanted his skill in handling computers. She made the introductions but had very little role apart from that. And then they accelerate this thing and get involved in the kidnapping in Moscow. And I don't think there's any evidence contemporaneous at the time that my client had anything to do with that. She subsequently learned. She's not charged with that. Correct. I think the government's argument is that she used the fact of the kidnapping there to make her threats really have more muscle. And isn't there some logic in that? There is. But the test is, is it a single criminal episode? And our argument is that it's really two criminal episodes. And, well, I'm not sure she could have been charged with the count one conspiracy. I suppose she could have been. But her role in that is so minimal, even by the indictment. Just those three overt acts. I don't know, 25 overt acts. She's only mentioned in three. And the first one comes to Judge Miner's question. She introduced them. And it's alleged in the conspiracy that she compelled him to act. But I think really the record just shows she introduced them. And did she come out of the thing? He was a stranger. She took him in. Well, there's that unusual evidence that how they met at the beginning of the case. There's always been something a little odd about that. Judge Trevisan noted about it. I don't think Armand, the victim, came into this totally innocently. He seemed to jump into this with some alacrity. And then it got out of hand. But, again, going back to the test, is it a single criminal episode or two separate ones? Looking at the evidence and looking at the indictment, it's more like two separate episodes. Assuming I'm correct on that, we get to the harmless error test. Is it more likely than not that this didn't have an impact on the jury on its verdict? The government didn't focus exclusively on that by any means in their argument. But they did mention it in opening statement. They did mention it in their initial closing statement, in their final closing statement. And it's just so prejudicial. Again, taking this extortion in Los Angeles, relatively minor if there is such a thing, and bringing in to the jury all this evidence of a worldwide Russian-Armenian mafia conspiracy with kidnapping and murder, it's just so prejudicial if it wasn't admissible because it should have been 404B evidence, then it clearly wasn't harmless error. The only other issue I want to make is on the grouping at sentencing. It has to do with one level. I think the court and the PSR just flatly got it wrong. The test for grouping is, do you have the same victim and are they connected by a common scheme? And here you have the same victim, Armen, and it's clearly a common scheme. Indeed, as they pointed out in the brief, that was the whole argument by which the government brought in the evidence as not 404B evidence. But the fundamental flaw that the PSR made was it, and this gets into the subsections of the sentencing guidelines, but it said that 880, which is the receiving, Section 880, receiving the proceeds, should be grouped separately under 2B1.1. And that the other two, which were the extortion and the conspiracy, get grouped under 2E2.1. My point is that the 2B1.1 has to do with amount of loss. It's used in theft cases. It's used in fraud cases. And Section 880, if you look at the guidelines, it usually says exactly which statutory violations belong in a guideline section. 2B1.1 doesn't mention receiving proceeds from extortion. So as the government pointed out in its brief, if it is correctly 2B1.1, then the grouping analysis says they must be kept separate. It specifically says that. But that's contingent on it being 2B1.1, which my point is that's fraud. It's in the nature of fraud. How much were the proceeds? But if you look at this as a whole, it was one common scheme with one victim. So they should have been grouped together. And that would have resulted in one point. The only other sentencing argument, and I think maybe Miss Landau will talk about Blakely, although we've heard it wasn't decided this morning, so maybe it's still premature. My client got a two point two level increase for restraint. The guidelines say you need to be things such as, as the government points out, being tied, bound, locked up. That didn't happen here. What most would happen here is he was invited to the house. He did get hit twice, but he was allowed to leave. I'm not sure that gets to the level of restraint. Any other questions? I'll submit. Thank you. Thank you. Thank you. May it please the court. Obviously, we're all waiting for the Supreme Court to rule on Booker and Fanfan. At least I can speak for most of the defense bar, which is waiting with bated breath. You're not alone. I figure that. So at the present time, Mr. Mnookin's only argument on appeal is that his sentence is that his sentence is imposed in violation of the Sixth Amendment because the judge increased his offense level based on two judicial findings that were made at sentencing using a standard of less than beyond a reasonable doubt. The adjustments in question are those first for role in the offense, which was two levels, and then an additional one level on the basis that the kidnap victim was held for more than, I believe it was, 14 days. No, it's more than seven days. Excuse me. Assuming that the Supreme Court rules that Blakely applies to the federal sentencing guidelines and adopts the interpretation used by this Court in Ameline, and then it's clear that Mr. Mnookin's sentence, his plain error in imposing sentence, and it has to be vacated and remanded for resentencing. I would just like to go through the elements and explain why. The government has argued that the evidence is not, that the error is not plain. So I just want to go through that. If the Court has any questions, I'd be happy to answer them. First, the error is obvious under current law. Under Ameline, it's obvious because the findings were made at sentencing using a standard of less than beyond a reasonable doubt. Is that true with regard to the seven days issue? Yes. Yes, Your Honor. There's two reasons for that. First, okay, first, the indictment itself. Mr. Mnookin pled to the face of the indictment, and the Court read the indictment in open court. If you review the colloquy that's contained in the change of plea hearing, the indictment itself does not refer to how long the kidnapped victim was held. There are a number of overt acts that allege that various defendants, including my client and other co-conspirators, committed acts on certain days. And they allege that the day that the victim was taken, but nowhere does the indictment allege the day that he was released. And, in fact, the overt acts in count one go on after the date of release. So he could not have admitted that the victim was held for more than seven days because it's not in the indictment. The second reason is that under this Court's related authority in Apprendi cases, a plea to the face of the indictment does not admit all the allegations. It only admits the elements. And the case for that is U.S. v. Thomas, which I referred you to in my 28J letter. So there was no specific colloquy on that particular fact, shall we say. And because there was no specific colloquy, the Court cannot find that my client made a knowing involuntary admission. So that level has to fall also. Of course, it's obvious for role in the offense. There was no charge of role in the offense. There was that is plain. I thought I had read something. I'm not saying I can put my finger on it at the moment. I thought I had read something more specific during the plea colloquy than just pleading guilty. Well, he said, you know, he never the Court, well, the judge asked him, did you admit the allegations of the indictment? And he said yes. But there certainly was, but again, we still have the problem. There's no colloquy on the length of time that the victim's held. There's no specific admission. And there's, and it's not even contained in the indictment. I think if you look at the change of plea transcript, I unfortunately don't have my copy of the excerpts. But the original change of plea transcript from pages 36 to 40 is the reading of count one of the indictment, including the overt acts. And at the end, at the end, the Court asks, he says, and how do you plead to count one of the indictment? Defendant Mnookin, guilty. Are you pleading guilty freely and voluntarily? Yes. Are you pleading guilty to count one because you, in fact, did the acts charged in the count that I just read? And he says yes. But again, under Thomas, you need a specific colloquy. And even if we didn't have Thomas, the overt acts that are alleged in the indictment are not specific enough to alert the defendant of this more than seven days. The fact that phone calls were made after the defendant, after the victim was kidnapped, and that there were statements made that, oh, we're not going to release him, he's not going to be released until you come up with the money, and that sort of thing, that is not an admission that the victim was still being held. In fact, those type of phone calls went on after the victim was finally released. If I don't, I'll just move on to the other elements of plain error. Clearly, Mr. Mnookin was prejudiced. If the three levels were taken off, his maximum sentence would have been 108 months. He received 132 months. And this error affects the integrity of the court's process because he received a sentence that is greater than the one he could have received based solely on his guilty plea. I did want to mention one other thing. In my brief and also in my 28J letter, I pointed out that notwithstanding Ameline, which I believe is also pending, I know is pending on rehearing, this court should remand for resentencing without empowerment of a sentencing jury. The cases of Thomas and Banuelos indicate that the empowerment of the sentencing jury would be completely improper. Mr. Mnookin has to be sentenced based on the offense to which he pleaded. The Ameline case suggested that empowerment of a sentencing jury would be appropriate, but Ameline did not even mention Thomas or Banuelos, which preceded it. And in both of those cases, which involved Apprendi error based on drug quantity and type, the court held that the proper remedy was not a remand to allow the government to prove the greater charge, but resentencing based on the actual plea. In Banuelos, for example, that resulted in a remand for resentencing based on an unspecified amount of marijuana with a maximum of five years. If there is no ---- Well, won't Mrs. Onucian max out in the February, somewhere in February? Oh, Your Honor, I don't ---- I'm sorry, I don't represent Mrs. Onucian. Oh, I know what I'm saying. I don't ---- I believe her sentence was 63 months or ---- February 16th, something like that. Thank you very much. Sorry, Your Honor. I'll reserve the remaining time for rebuttal if that's ---- Thank you, counsel. Thank you. May it please the Court, James Aquilin on behalf of the government and with me is Assistant U.S. Attorney Brian Hofstadt. I'll be addressing Mrs. Onucian's challenge to her conviction. My colleague will be handling the sentencing issues for both Defendant Mnookin and Defendant Onucian. The conspiracies that were charged in this case constitute a logically related series of events. Armin is compelled to commit fraud for this organization. He flees the organization. Members of the organization orchestrate and use foreign communications to facilitate the kidnapping of a family member. In order to compel Armin's return to Los Angeles and in order to get him to continue to commit crimes for them, so as to pay back the money these defendants believe Armin owed them. Armin comes back to Los Angeles and under the watchful eye of law enforcement, he continues to engage in fraud at the defendant's direction and makes repayments, including to Defendant Onucian. The government never ---- Mrs. Onucian is not charged with the hostage-taking conspiracy. The government never argued that Mrs. Onucian participated in the orchestration and execution of the kidnapping. What the government alleged and what the government proved at trial was that from its inception, Defendant Onucian and her husband, Co-Defendant Pogos Katchetjian, were intended beneficiaries of the kidnapping. It was Mrs. Onucian who set the chain of events in play. It's Mrs. Onucian who initially meets Armin, who not only introduces Armin to Co-Defendants Urik and Hovik, but provides Urik Armin's contact information, his telephone number, so that Urik calls him. And Armin has no idea how Urik has found his phone number. Urik shows up at Armin's house because Mrs. Onucian has given Urik Armin's address. And when Armin goes to the initial meeting after first meeting Urik and is threatened very clearly by her Co-Defendants, he returns to Mrs. Onucian and she says, these people are very serious. Mrs. Onucian is compelling him to commit fraud. Her Co-Defendants are compelling him to commit fraud. And upon his flight from Los Angeles, it's Defendant Onucian who is the first defendant to actually go and look for Armin. Phone records show her in contact with her Co-Defendants every day of the approximately eight days between Armin's flight from Los Angeles and return, during which time Archer is kidnapped in Moscow. It is absolutely provative of this Defendant's intent that the threats that she made upon Armin's return to Los Angeles could be carried out. In fact, in United States v. Polizzi, this circuit made very clear that if the government has to prove that this Defendant used implicit or explicit threats, which means an intent to instill fear in this victim, we look at the surrounding circumstances. And we look at the particular circumstances of the victim. Here we have, for a significant period of time, Archer is captive. He's captive from on or about Armin's flight on February 20th through, and this appears in the GER, approximately April 9th, which is when we first get confirmation that Archer is alive and been released. Remember that at the March 22nd meeting, the meeting where Mizinusian brings Muscle, Co-Defendant Hovsep Kashishian, who smacks Armin around and pantomimes a gun to Armin's head, they don't know whether Archer is alive or dead. And if we are to look at whether she could carry out the threats that she clearly made in recorded conversations upon Armin's return to Los Angeles, look to the March 22nd meeting. Where she name-drops Kindomais, Alo, a relative, and other known mobsters known to this victim at a time when the kidnapped victim could be alive or dead. What best evidence is there that this woman has the means to carry out her threats? If the government has to prove beyond a reasonable doubt that this Defendant intended to instill fear in Armin, what better evidence is there that this woman has the means to carry out her threats? If the government has to prove beyond a reasonable doubt that this Defendant intended to instill fear in Armin, what better evidence is there than the fact that what she threatened had already happened and was occurring at the time of those threats? I'd like to direct the Court briefly to one specific phone conversation, March 26th of 2001. It's four days after the meeting where all the Co-Defendants meet with Armin and he is physically beaten. It's during that call, four days after the meeting between Defendant Nusian and Armin, where she reminds Armin, your wife is also in a very difficult situation over there. What she's saying to him is she's threatening him. She's making sure that he understands that more than Archer's life is at stake here. She's told him that she knows where his wife is. She knows where his kids are. And it's here it is, four days after he's been physically beaten, at a time when no one knows whether Archer is alive or dead, that she is bringing to his attention, your wife is in a difficult situation over there. When are you going to pay me the money? The Government would submit that the evidence was clearly probative of this Defendant's intent. It was important to the Government's ability to establish the surrounding circumstances, the circumstances around which these threats were made to this Defendant. It was critical to one of the elements of the offenses for which this Defendant was charged. And to the extent that the 403 analysis would tip in the favor of Defense Counsel's argument here, the District Court gave a limiting instruction. At the time that the judge gave instructions, he gave a limiting instruction. It's the Government's position that the District Court didn't abuse its discretion in admitting evidence of the hostage-taking. And on that issue, we would submit, and I'll refer to my counsel, co-counsel, with respect to sentencing, unless there are any questions. Good morning, Your Honors. Brian Hofstadt for the United States. Speaking first to Defendant Mnuchin's sentencing issues, the primary issue that Defense Counsel has raised this morning is whether or not there was any plain error in the District Court's decision not to group the conspiracy to use extortionate means, to collect extensions of credit and the actual substantive count, separately from the receipt of proceeds count. And the Government's position is set forth in its brief is that there was no plain error here. The relevant test, and I think that the guideline to focus on, is 3D1.2b, which is whether or not the crimes involve the same victim. And the overarching concern is whether or not they involve substantially the same harm. And in this case, the District Court did not plainly err in treating them separately because they did not involve the same harm and did not involve the same victim. Appendix A of the guidelines very clearly specifies that the two extortion counts are evaluated under 2E2.1, and the receipt of proceeds count is evaluated under 2B1.1. The guideline that applies to the extortion counts does not encapsulate in any fashion the amount of loss that's actually incurred. The amount of loss that's actually received by the proceeds. And, in fact, the guideline note specifically states that, you know, that loss is excluded from its ambit. 2B1.1, however, is based upon the amount of loss, the amount of the receipt of the proceeds. So they measure harm differently. And, in fact, to collapse the two of them together goes against the general philosophy of Section 3D, which is to recognize incremental harm that occurs in different types of harm. So for that reason, the harm's not the same. And as we also noted in our brief, the victims are not the same. The victim of the extortion counts is Arman, the person who was extorted. The victim of the receipt of proceeds account is more properly characterized as the societal interest in the legitimate collection of debt. And this Court in various decisions has recognized that where there's a different victim, society versus an individual victim, that it's appropriate not to group those counts. As to the restraint issue briefly mentioned by counsel today, whether it was appropriate to impose the two-level physical restraint, it's fairly clear from the case law we cited in our brief that detaining a person in a room against their consent constitutes physical restraint. And that's precisely what the defendant and her co-conspirators did on March 22nd to Arman when they twice refused to let him leave the room. Whether or not he was able to leave eventually or was able to come back voluntarily at some other point is irrelevant to the fact that at that meeting he was physically restrained and was unable to leave. With respect to Defendant Mnookin, the defendant, the defendant Mnookin has conceded that at least 30, that the base offense level 24 and the six levels for ransom are appropriately imposed, notwithstanding Blakely. The only two remaining factors that she contends are subject to attack are the enhancement for the victim being able to be held for longer than seven days and the role of adjustment. And while the government recognizes that role was not something the defendant admitted to during his plea colloquy, the amount of time that the victim was detained was something that he admitted to. First of all, the indictment itself does note, count one of it, does note on page three of the extract of record that Arshour, the victim in Moscow, was taken into custody by the kidnappers on February 23rd. And if you look on page five, it notes that on March 6th, March 10th and March 13th that they basically told Armin that they wouldn't release Arshour unless he cooperated with them. The obvious implication of that is that he's still in their custody. And those facts are facts that the defendant admitted to. If you look at excerpt of records 21, 51, 57 and 70, as well as the other pages we cite in our brief, it's very clear that the district court was requiring the defendant and that the defendant admitted to the overacts of that particular conspiracy and therefore admitted to that fact the length of time that he was detained. Defendant in her 28J letter cites this Court's pre-Blakely decision in Thomas. In that decision, however, the defendant refused to admit the amount of drug quantity, and this Court held that because he didn't admit drug quantity as part of his plea colloquy, he couldn't be sentenced on that basis for purposes of apprendi. But what the Thomas Court did recognize is that even though it said that drug quantity was not an element of the crime, that a defendant who did admit drug quantity could be sentenced on that basis. That's precisely what we have here. Even though the length of time that Archer was held was not an element of the offense, the defendant could admit to it and could be sentenced on that basis. Now, looking at the indictment, it does make reference to and describe Archer as a hostage on the subsequent dates. Defendant has argued that there were similar threats and statements made even after Archer was released. Is that correct? The last overact for that conspiracy is over in Act 17 on page 5 of the excerpts on March 13th. The threats were made such that, inferring backwards as I understood it, the fact that a threat was made or a statement was made referring to what would happen to Archer and the fact he was a hostage does not itself represent an admission that he was a hostage because you can make the threat without the underlying fact being true. Well, except for the fact that he did, in fact, admit that Archer was, in fact, taken hostage initially. And there's no evidence in the record, and there was none at trial, and it's not alleged in the indictment that there were threats made after the date on which Archer was eventually released, which I believe was April 9th. So there were no threats made about him at that point. In fact, the evidence indicated that Defendant Hovick, a defendant Igerian, told Armin, I believe on March 18th, that, you know, I've intervened and we've let him go. And the threats regarding him, while Armin and the FBI didn't know for sure that he'd been released until April 9th when they actually saw him, there were no threats about Archer being in custody, being in the kidnapper's custody after the date when Hovick said, we've released him. So all the threats were during the period of time that he was, in fact, in their custody. I think hopefully that addresses the Court's question. So from that, you take the statement that's contained within the indictment making reference to Archer as a hostage and what would happen to him to be implicitly but inherently an admission or acknowledgement that he was still a hostage as of that date. Given the fact that it was the defendant who was saying, you know, if you don't cooperate with us or if you do cooperate with us, we'll let him go. I mean, the defendant would not have made that statement unless, particularly in light of the fact that he'd called the defendant's wife and called Armin's wife and called and talked to Armin many times before, and the fact that it was known and the defendant admitted here at the change of plea that Archer was, in fact, taken. He wouldn't have made that threat if that weren't, in fact, the case. And the fact that the threats against him stopped after the point at which he was released indicates that, again, corroborates the fact that he was in custody at the time these threats were made and was still in custody at that time. But just briefly, the government does believe as well that after, depending on what the Supreme Court does, we're all kind of in this land of unknown, but that a sentencing jury would be appropriate on remand if this Court's decision in Amline remains a valid law after the Supreme Court decides Booker and Fanfan. Defendant Mnookin cites Thomas and Van Willis. Both of those are pre-Blakely decisions. Blakely, you know, greatly transmogrified, at least potentially greatly transmogrified the landscape in this area and provided the basis for the Amline court to reach the decision that it did. The Amline court's decision is pretty much on all fours with the defendant who pled guilty. It now raises the Blakely issues here and was authorized to go back for a sentencing jury. So we believe that a sentencing jury may be appropriate on remand should Amline remain relevant after Booker and Fanfan. Unless there are any further questions. One other subject, and that's how close we are to potential release days as Blakely shakes out. Suppose it shakes out so that I think it's for Defendant Onosian. If you don't have any upward adjustments, have you calculated or do you know how close we are to a potential release date for her? Yes. The upward adjustments, the three that she challenges, the role adjustment, the physical restraint and potentially the grouping, which may or may not fall under Amline, but let's just assume that it does. You have a base offense level of 20 with her criminal history category of 1, which would yield a sentencing range of 33 to 41 months. At this point in time, she's been in custody about 39 months, so she's bumping right up against that amount. And I think under this Court's decision in Castro, you know, depending on how fast the Court wishes to move, it may be appropriate to remand it. At that point, the government would seek to keep her in custody and retry those issues because we believe, based on our argument and the facts we set forth in the brief, that we can prove those additional enhancements beyond a reasonable doubt. As to Mr. Mnookin, he's conceded the sentences anywhere between 87 to 108 months, even assuming that the Court does not agree with the government as to the one enhancement. He's also been in custody for just 39 months. So this Court is, you know, is able to even defer consideration of his issue pending Booker and Fanfan. We have plenty of time with him, but she may raise a Castro type. I believe that's correct, yes. Unless there are any further questions, the government would submit. Thank you. Thank you, counsel. Thank you. Your Honor, Ms. Onucian's release date is August 2006, so 13, 14 months. Well, based on the current release date, the question is, if you toss out the enhancements, it sounds like the government concedes that she may actually already be into the time period of the potential guideline range. I think she would be. Five levels would put her, I think, probably release date right about now. Okay. Well, so are you familiar with our decision in Castro? I am, Your Honor. Okay. Do you see this as falling under that if that's where she is? I do. It gets confusing because you'd also want to have a decision on the 404B issue. Do you split the case and send part back and part not? So we wait for the Supreme Court to decide. The point that Mr. Aquilina made with the transcript about my client saying, these people are serious and your wife's in trouble. I think Ms. Onucian's kind of in the middle ground here. It's more of a warning than a threat. Remember, she had taken Armand into her house and had lived with her and was a friend and introduced these people looking for business opportunities. So I think she's part victim and part perpetrator here, but certainly not in the level of the other two. And I agree with the government that evidence may be probative, but it's not critical to the government's case. You look at the indictment. There's 29 overt acts. Not a single one of them reference the Moscow kidnapping. There's only that one paragraph at page 18 of the excerpts of record and the means by which the conspiracy was achieved. When it says defendants would threaten Armand with the involvement of conspirators overseas and in L.A., some of whom had previously kidnapped Armand's relatives in Moscow. You just take that out and there's nothing left. They don't need this at all to the case. If you have an indictment that runs five, six pages and you only have one reference and one paragraph, it can't be critical to the government's case. And then you balance it with the prejudice, as I pointed out, and it becomes overwhelming that it should have been excluded. Thank you. Thank you, counsel. I wanted to address the government's argument that Mr. Manoukian admitted the amount of time that the victim was held. The government has virtually conceded that it was by implication only that he could have admitted it. Implication is not sufficient for a knowing and voluntary admission. It's simply not supported by his guilty plea. And Thomas clearly states that you need a specific involuntary, a specific colloquy on the fact admitted. And finally, I wish to point out that Blakely is an application of apprendi, and there's no reason to think that Thomas and Banuelos will not survive whatever the fruits of the Supreme Court decision are. But that I'm willing to submit. Thank you, counsel. Thank you. Thank you. All cases argued will be submitted. Final case of the morning for argument is U.S. versus Denton. May it please the Court.
judges: Reinhardt, Clifton, Weiner